IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 36259

| | |
|---|---|
| WILLIAM LIGHTNER and MARCIA LIGHTNER, | ) ) ) | 2010 Opinion No. 53 |
| Plaintiffs-Appellants, | ) ) | Filed: August 5, 2010 |
| v. | ) ) | Stephen W. Kenyon, Clerk |
| JOHN HARDISON, BRENT REINKE, STEVE NELSON, | ) ) ) ) | |
| Defendants-Respondents. | ) ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County.  Hon. Ronald J. Wilper, District Judge.

Order of the district court granting motion for summary judgment, <u>affirmed</u>.

William Lightner, Boise, pro se appellant.

Marcia Lightner, Garden City, pro se appellant.

Hon. Lawrence G. Wasden, Attorney General; Mark A. Kubinski, Deputy Attorney General, Boise, for respondent.

GUTIERREZ, Judge

William and Marcia Lightner filed a civil rights complaint alleging that in terminating their visiting privileges, the Idaho Department of Correction (IDOC) violated their constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as their Idaho State Constitutional rights.  The Lightners appeal the district court's order granting respondents John Hardison, Brent Reinke, and Steve Nelson's motion for summary judgment.  For the reasons stated below, we affirm.

## I.

## BACKGROUND

In an underlying criminal case, William was convicted of lewd conduct with a minor under sixteen in violation of Idaho Code § 18-1508.  The district court sentenced William to a

unified term of twenty years, with a minimum period of confinement of three years, and placed him on a retained jurisdiction program.  The district court received a report from the IDOC recommending that the court relinquish jurisdiction, which the district court followed.  While in prison, William met Marcia who was a contract vendor at the Idaho State Correctional Institute (ISCI).  In 1997, they got married and William remained incarcerated.  In 1998, William used the IDOC grievance process with regard to some visitation issues.  He objected to the prison policy that denied visitation to the couple.  As a result, restricted visitation was granted, but the Lightners still objected to the form of visitation granted.  Around 2000 or 2001, the Lightners received full visitation privileges.  In 2005, William was granted parole.

While out on parole, William absconded from supervision and fled the country to Belize with Marcia.  He was subsequently apprehended, his parole was revoked, and he was returned to the custody of the IDOC to serve his full prison term.  On April 10, 2007, Marcia was arrested on felony charges for harboring a felon in violation of I.C. § 18-205.[1]  As a result of her arrest, the ISCI Warden at the time, Warden Blades, terminated her visiting privileges.  In July 2007, Warden Blades reinstated Marcia's visiting privileges on the condition that Marcia keep the facility informed on the status of her case.

The Lightners have accrued citations for violating facility visitation policies.  For example, in November 2006, William accepted a visitation restriction for violating the visitor contact rules at the beginning and conclusion of his visits with Marcia.  In December 2006, William was issued a disciplinary offense report for an inappropriate goodbye.  In July 2007, other visitors to the ISCI complained that Marcia was changing the order of the visitors' log and was dressed inappropriately for visiting, including sheer, revealing clothing, and a lack of undergarments.  In August 2007, Marcia failed to display her disabled identification permit when she parked in a handicap parking space.  When she was reminded to display her permit, she exhibited hostility toward the officer.  The Lightners filed officer misconduct complaints a number of times following the officers' corrective actions.

In August 2007, Warden Hardison replaced Warden Blades at ISCI.  On October 1, 2007, Warden Hardison terminated Marcia's visiting privileges based on her previous arrest and

---

[1]     This charge stemmed from Marcia allowing a woman to stay with her that had escaped from prison.  In 1989, Marcia also received a withheld judgment for an unknown charge.

unresolved criminal charges, as well as William's history of absconding the country while on parole, and a variety of past visiting issues involving the Lightners. Marcia ultimately pled guilty to obstructing justice and received a two-year probation sentence. As part of the plea agreement, the charge of harboring a felon was dismissed. The Lightners' visitation privileges were thereafter reinstated.

The Lightners initiated a civil rights complaint pursuant to 42 U.S.C.A. § 1983 alleging that the termination of their visiting privileges as of October 1, 2007, violated their constitutional rights. The Lightners sought compensation for the period of separation, requesting an award of $120,000 and $12,500 per missed visit, for a total of nearly $1.5 million. As part of the litigation, the defendants filed a motion for summary judgment. After a hearing, the district court issued an order granting defendants' motion for summary judgment primarily on the basis that William had failed to exhaust the IDOC grievance process. The Lightners appeal.

## II.

## STANDARD OF REVIEW

Summary judgment under Idaho Rule of Civil Procedure 56(c) is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. On appeal, we exercise free review in determining whether a genuine issue of material fact exists and whether the moving party is entitled to judgment as a matter of law. *Edwards v. Conchemco, Inc.*, 111 Idaho 851, 852, 727 P.2d 1279, 1280 (Ct. App. 1986). When assessing a motion for summary judgment, all controverted facts are to be liberally construed in favor of the nonmoving party. Furthermore, the trial court must draw all reasonable inferences in favor of the party resisting the motion. *G & M Farms v. Funk Irrigation Co.*, 119 Idaho 514, 517, 808 P.2d 851, 854 (1991); *Sanders v. Kuna Joint School Dist.*, 125 Idaho 872, 874, 876 P.2d 154, 156 (Ct. App. 1994).

The party moving for summary judgment initially carries the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Eliopulos v. Knox*, 123 Idaho 400, 404, 848 P.2d 984, 988 (Ct. App. 1992). The burden may be met by establishing the absence of evidence on an element that the nonmoving party will be required to prove at trial. *Dunnick v. Elder*, 126 Idaho 308, 311, 882 P.2d 475, 478 (Ct. App. 1994). Such an absence of evidence may be established either by an affirmative showing with the moving party's own evidence, or by a review of all the nonmoving party's evidence and the

3

contention that such proof of an element is lacking. *Heath v. Honker's Mini-Mart, Inc.*, 134 Idaho 711, 712, 8 P.3d 1254, 1255 (Ct. App. 2000). Once such an absence of evidence has been established, the burden then shifts to the party opposing the motion to show, via further depositions, discovery responses or affidavits, that there is indeed a genuine issue for trial or to offer a valid justification for the failure to do so under I.R.C.P. 56(f). *Sanders*, 125 Idaho at 874, 876 P.2d at 156.

The United States Supreme Court, in interpreting Federal Rule of Civil Procedure 56(c), which is identical in all relevant aspects to I.R.C.P. 56(c), stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citations omitted). The language and reasoning of *Celotex* has been adopted in Idaho. *Dunnick*, 126 Idaho at 312, 882 P.2d at 479.

## III.

## ANALYSIS

The Lightners make several claims on appeal: they assert that they did not fail in exhausting the administrative grievance procedure before bringing this action, and in the alternative, that they did not have to exhaust the administrative grievance procedure before bringing this action; they assert that their constitutional rights were violated; they assert that the termination of their visiting privileges resulted in a loss of consortium; they assert that they were harassed and retaliated against by prison officials; and they assert that it was a violation of the Double Jeopardy Clause to terminate their visiting privileges.[2] The respondents' main argument is that William's claims are all barred due to his failure to exhaust the administrative grievance

---

[2]  The Lightners raise even more issues in their reply brief. We do not address them here because "this Court will not consider arguments raised for the first time in the appellant's reply brief." *Myers v. Workmen's Auto Ins. Co.*, 140 Idaho 495, 508, 95 P.3d 977, 990 (2004).

process. Without deciding whether the grievance process was exhausted, we conclude that the issues raised by the Lightners fail on the merits.

**A.      Due Process Claim**

The Lightners assert that the termination of their visiting privileges violated their constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution as well as their Idaho State Constitutional rights. More specifically, the Lightners argue that they have a liberty or property interest in visiting each other, and that their due process rights were violated when their visitation privileges were terminated without a hearing.[3]

To determine whether an individual's due process rights under the Fourteenth Amendment have been violated, a court must engage in a two-step analysis. First, it must decide whether the individual's threatened interest is a liberty or property interest under the Fourteenth Amendment. *Schevers v. State*, 129 Idaho 573, 575, 930 P.2d 603, 605 (1996). Only if it finds a liberty or property interest will the court reach the next step, in which it determines the extent of due process procedural protections. *Id.* The United States Constitution protects "certain kinds of highly personal relationships." *Roberts v. United States Jaycees*, 468 U.S. 609, 618-20 (1984). Outside the prison context the right to maintain certain relationships may exist. However, when incarceration is a factor, those protections have been limited. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

> The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. And, as our cases have established, freedom of association is among the rights least compatible with incarceration. Some curtailment of that freedom must be expected in the prison context.

*Id.* (internal citations omitted).

Protected liberty interests can arise from two sources, either the Due Process Clause or the laws of the states. *Kentucky Dep't of Corrs v. Thompson*, 490 U.S. 454, 460 (1989). The Due Process Clause does not in itself create a liberty interest in prisoner visitation. The denial of

---

[3]      The Lightners cite several cases to bolster their argument that they have a liberty interest in visiting each other. However, the authority cited either does not support their position or is distinguishable from this case.

prison access to a particular visitor is not independently protected by the Due Process Clause because it is well within the terms of confinement ordinarily contemplated by a prison sentence. *Id*. at 461. However, state statutes and regulations can create enforceable liberty interests in the prison setting where none would have existed otherwise. *Id.* A state does this by placing substantive limitations on official discretion. *Id.* at 462. The most common way a state creates a liberty interest is by adopting regulations which establish substantive predicates to govern official decision-making, and also by mandating the outcome that must be reached when the relevant criteria have been met. *Id.* There must be particularized standards or criteria to guide the decisionmakers, and the criteria must serve to limit discretion. *Id.* If a decisionmaker can make a decision for any constitutionally permissible reason or for no reason at all, then the state has not created a liberty interest. *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). The regulations must contain "'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow, in order to create a liberty interest." *Thompson*, 490 U.S. at 463. The search is for "*relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining whether an inmate may be deprived of the particular interest in question." *Id.* at 464 n.4 (emphasis in original).

When the language of state statutes and regulations create a right, that right is entitled due process protection. *See Mendoza v. Blodgett*, 960 F.2d 1425, 1432-33 (9th Cir. 1992) (holding that the termination of visiting privileges violated due process where the prison regulation contained explicit mandatory language that visiting privileges could be suspended only after a finding of guilt); *Taylor v. Armontrout*, 894 F.2d 961, 964-65 (8th Cir. 1989) (holding that a regulation that stated that people whose names appeared on a list "shall" be allowed to visit created a right to visitation entitled to due process protection). However, where a regulation lacks the requisite relevant mandatory language, it does not establish a liberty interest entitled to the protections of the Due Process Clause. *See Thompson*, 490 U.S. at 463-65 (holding that a regulation that stated a visitor "may be excluded" when officials find reasonable grounds to believe that the "visitor's presence in the institution would constitute a clear and probable danger to the institution's security or interfere with [its] orderly operation," did not contain the necessary mandatory language to create a liberty interest); *Caraballo-Sandoval v. Honsted*, 35

F.3d 521, 524-25 (11th Cir. 1994) (finding that no liberty interest was created by a regulation that gave the warden discretion to restrict visitation for reasons such as security).

The analysis surrounding whether a regulation creates a liberty interest and is therefore entitled due process protections was subsequently modified by the United States Supreme Court. *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). *Sandin* clarified the standard for determining when a prisoner has a protected liberty interest by stating:

> . . . we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* This approach has been utilized in determining whether the termination of visiting privileges implicates due process protection. *See Ware v. Morrison*, 276 F.3d 385, 388 (8th Cir. 2002) (following the principle from *Sandin* that the suspension of the prisoner's visitation privileges with respect to his wife and two other women did not impose an atypical and significant hardship and therefore did not implicate the Due Process Clause). Furthermore, this approach has been adopted by the Idaho Supreme Court. *See Schevers v. State*, 129 Idaho 573, 576, 930 P.2d 603, 606 (1996) (stating that the "atypical and significant hardship" test from *Sandin* is the proper one to be used in determining if there is a liberty interest protected by the Due Process Clause of the Idaho Constitution).

The IDOC visiting policy states in pertinent part:

> **01.     No Right to Visit Established.**     Nothing in Section 604 establishes a right to visit any inmate. Nothing in Section 604 should be interpreted as an expectation that visitation will be approved between any person and any inmate if the Department has suspended, terminated, or revoked a visitor or inmate's visiting privileges.
> **02.     Visitation at the Discretion of the Department.**     Inmate visitation is allowed at the discretion of the facility head or designee. Each division may develop standard operating procedures and field memoranda to govern inmate visiting.
>          . . . .
> **05.     Restricted Visitors.**     The following people will not be granted permission to visit an inmate . . . .
>              . . . .

7

**j.** A person who has pending criminal charges or who is the subject of a criminal investigation will not be permitted to visit an inmate, except upon written approval of the facility head or designee.

**06.** **Termination of Visits.** A visit may be suspended, restricted, or terminated at any time, for any period of time (including permanently) . . . .

. . . .

**c.** At the discretion of the facility head or designee in accordance with standard operating procedures.

IDAPA 06.01.01.604.01, .02, .05(j), .06(c).

The IDOC visiting policy does not contain the requisite mandatory language needed to create a liberty interest as it provides no specific limitations on when visiting privileges may be suspended or terminated. In fact, it makes clear that there is no right to visit any inmate. The policy states that visitation privileges are left entirely up to the discretion of the Warden. Therefore, it was not beyond the authority of the Warden to terminate these privileges.[4] In addition, the termination of the Lightners' visiting privileges did not impose an atypical and significant hardship because limited visitation is something that would normally be anticipated as a result of incarceration. Because the state did not create a liberty interest in visitation through the IDOC policy, and because the termination of visiting privileges did not impose an atypical and significant hardship, the Lightners were not entitled to due process protections.[5]

## B. Loss of Consortium Claim

The Lightners assert that the termination of their visiting privileges resulted in a loss of consortium and that the district court erred in dismissing Marcia's loss of consortium claim. A claim for loss of consortium "is a wholly derivative cause of action contingent upon a third party's tortious injury to a spouse." *Zaleha v. Rosholt, Robertson & Tucker, Chtd.*, 131 Idaho

---

[4] Marcia repeatedly argues that termination of her visiting privileges was improper because she had not yet been convicted of a crime. However, the fact that she had not yet been convicted of a crime when her visiting privileges were terminated does not mean she was not a security risk. *See Bell v. Wolfish*, 441 U.S. 520, 547 n.28 (1979) (holding that "[t]here is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates" because it may be that they present a greater risk to security in certain circumstances).

[5] The district court went on further to address the Lightners' argument that the policy is unconstitutional. However, because we have determined that there is no liberty interest in visitation privileges, we do not address the further analysis of the district court on whether the four-factor test from *Turner v. Safley*, 482 U.S. 78, 89-90 (1987) applies or creates a constitutional violation.

254, 256, 953 P.2d 1363, 1365 (1998). A loss of consortium claim is necessarily dependent on the injured spouse's success or failure in the underlying claim against the third party. "When there has been no physical injury, the loss of consortium issue is dependent upon the issue of intentional infliction of emotional distress suffered by the injured spouse." *Id.* William has not been successful in any underlying claim. Therefore, Marcia's claim for loss of consortium fails since it is contingent upon the success of William's claim.

Furthermore, "[f]ederal courts have almost unanimously denied derivative loss of consortium claims based on the violation of the spouse's civil rights." *Jeremiah v. Yanke Machine Shop, Inc.*, 131 Idaho 242, 249, 953 P.2d 992, 999 (1998). In that case, Jeremiah was fired from his job for work performance reasons after communicating complaints to his supervisors about co-workers calling him names and harassing him based on his national origin. He filed a discrimination claim with the Idaho Human Rights Commission (IHRC). After an investigation, the IHRC determined that Jeremiah had not been subject to workplace harassment based on his national origin. Jeremiah filed suit against his former employer and several individual employees, and his wife made claims for loss of consortium against all respondents. The district court found that in looking at the evidence most favorably to Jeremiah and giving him the benefit of every reasonable inference, there was no evidence that was so severe as to support a claim for intentional infliction of emotional distress. As a result, the district court also dismissed his wife's loss of consortium claim. *Id.* at 245-46, 953 P.2d at 995-96. The Idaho Supreme Court affirmed, finding no severe emotional distress and holding that remedies allowed under the IHRA do not allow a loss of consortium claim when the underlying cause of action is based on the IHRA. *Id.* at 249, 953 P.2d at 999. Here, William asserts that his civil rights were infringed, arguing that the termination of their visiting privileges violated his constitutional rights. However, a derivative loss of consortium claim based on the violation of William's civil rights will fail because 42 U.S.C.A. § 1983 does not recognize a loss of consortium cause of action. Therefore, Marcia's loss of consortium claim fails as a matter of law.

## C. Retaliation and Double Jeopardy Claims

The Lightners assert that the district court failed to rule on their retaliation and double jeopardy claims. The state counters that because the Lightners have not obtained an adverse ruling from the district court on these claims, they were not preserved for appeal and cannot be addressed here. However, the district court's dismissal of the Lightners' entire complaint for

failure to exhaust administrative remedies served as an adverse ruling on those claims, and as a result they are properly before this Court.

With regard to their retaliation claim, the Lightners argue that the termination of their visiting privileges was just another act in a sequence of retaliatory actions by IDOC officials over the past twelve years. "To state a first amendment claim for retaliation, a prisoner must allege that (1) the type of activity he engaged in was protected under the first amendment, (2) the state impermissibly infringed on his right to engage in the protected activity, and (3) the retaliatory action was not reasonably related to a legitimate penological purpose." *Drennon v. Craven*, 141 Idaho 34, 39, 105 P.3d 694, 699 (Ct. App. 2004). In addition, some courts require an inmate alleging retaliation to show that his protected conduct was a substantial or motivating factor in the questioned decision. *Id.* The Lightners have failed to make a sufficient showing that terminating visiting privileges was not reasonably related to a legitimate penological purpose and thus, have failed to make a sufficient showing on an essential element of their retaliation claim. Therefore, the Lightners' retaliation claim fails as a matter of law.

With regard to their double jeopardy claim, the Lightners argue that because their visiting privileges had been previously suspended, it was a violation of double jeopardy to terminate their privileges a second time. "The Double Jeopardy Clause of the Fifth Amendment provides that 'no person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb.' This clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense." *Gibson v. Bennett*, 141 Idaho 270, 276, 108 P.3d 417, 423 (Ct. App. 2005). The termination of the Lightners' visiting privileges does not fall into any of the circumstances in which double jeopardy would apply. Therefore, the Lightners' double jeopardy claim fails as a matter of law.

## IV.

## CONCLUSION

The district court did not err in granting the defendants' motion for summary judgment. The IDOC policy did not create a liberty interest in visitation, and the termination of the Lightners' visitation privileges did not impose an atypical and significant hardship. Therefore, the Lightners were not entitled to due process protections. Furthermore, the loss of consortium claim, the retaliation claim, and the double jeopardy claim all fail as a matter of law.

10

Accordingly, we affirm the order of the district court granting respondents their motion for summary judgment.

Chief Judge LANSING and Judge MELANSON, CONCUR.